UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HOPE BAKER, | )  1:14CV0777 |
| | ) |
| Plaintiff | ) |
| | )  JUDGE PATRICIA GAUGHAN |
| v. | )  (Mag. Judge Kenneth S. McHargh) |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| | ) |
| Defendant | )  REPORT AND |
| | )  RECOMMENDATION |

McHARGH, MAG. JUDGE

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the court is whether the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiff Hope Baker's application for Social Security Disability and Supplemental Security Income benefits under Title II and XVI of the Social Security Act, 42 U.S.C § 1381 et seq., is supported by substantial evidence and, therefore, conclusive.

I.  PROCEDURAL HISTORY

On May 16, 2011, Plaintiff Hope Baker ("Baker") applied for Disability Insurance and SSI benefits.  (Doc. 13, tr., at 17, 201, 207.)  Baker stated that she became unable to work because of her disabling condition on May 22, 2007.  (Tr., at

203, 207, 232.) Baker listed her physical or mental conditions that limit her ability to work as "stroke, weakness on right side, shoulder injury." (Tr., at 232.)

Baker's application was denied initially and upon reconsideration. (Tr., at 17, 110-111, 138-139.) On March 30, 2012, Baker filed a written request for a hearing before an administrative law judge. (Tr., at 78.)

An Administrative Law Judge ("the ALJ") convened a hearing on July 11, 2012, to hear Baker's case. (Tr., at 30-77.) Baker was represented by counsel at the hearing. (Tr., at 30, 33.) Nancy G. Borgeson, Ph.D., a vocational expert, attended the hearing and provided testimony. (Tr., at 32, 67-73.)

On November 16, 2012, the ALJ issued his decision applying the standard five-step sequential analysis[1] to determine whether Baker was disabled. (Tr., at 14-

---

[1] Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(I). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. Id. § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. Id. § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. Id. § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other

25.)  Based on his review, the ALJ concluded Baker was not disabled.  (Tr., at 17, 25.)

The Appeals Council denied Baker's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (Tr., at 5-8.)  Baker now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Baker briefs six issues for review:

1.  Whether the ALJ's decision is supported by substantial evidence having omitted cervical radiculopathy and thalamic pain syndrome as a severe impairment at Steps 2 and thereafter throughout the sequential analysis.

2.  Whether the ALJ committed an error of law by not considering Listings 11.04 for the diagnosis of a stroke and 1.04 for cervical radiculopathy at Step 3.

3.  Whether the ALJ erred by not consulting a medical expert when considering whether Hope met or equaled any of the listings of impairments.

4.  Whether the ALJ properly evaluated the treating source opinion of Dr. Sundararajan.

5.  Whether the ALJ's RFC finding is supported by substantial evidence and whether the RFC finding was made following the requirements of SSR 96-8p based on the limitations imposed by

---

work, in which case the claimant is not disabled.  Id. § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997).

*Wilson  v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

3

Plaintiff's cerebrovascular accident, bilateral shoulder injuries, thalamic pain syndrome, cervical radiculopathy, depression, and other impairments.

> [a.] Whether the ALJ's RFC finding is supported by substantial evidence when it lacks any reference or accommodation for hand-held assistive devices, despite substantial evidence supporting Plaintiff's use of the same throughout the relevant time-frame.

> [b.] Whether the ALJ's RFC finding is supported by substantial evidence considering the treating medical source opinion of Dr. Sundararajan limiting Plaintiff to less than frequent sitting, standing, walking, bending, stooping, and grasping.

6. Whether the ALJ's credibility finding is supported by substantial evidence and whether it complies with the directives of SSR 96-7p.

(Doc. 16, at [ii].)

## II.  PERSONAL BACKGROUND INFORMATION

Baker was born on March 1, 1966, and was 41 years old as of her alleged disability onset date.  (Doc. 13, tr., at 24, 86.)  Accordingly, Baker was at all times considered a "younger person" for Social Security purposes.  See 20 C.F.R. §§ 404.1563(c), 416.963(c).  Baker graduated from high school, and is able to communicate in English.  (Tr., at 24, 232.)  She has past relevant work as a Babysitting/ Child Monitor; Teacher's Aide; and MRDD Aide.  (Tr., at 24.)

III.  MEDICAL EVIDENCE[2]

Disputed issues will be discussed as they arise in Baker's brief alleging errors by the ALJ.  A short summary of relevant medical history follows here.  As noted earlier, Baker applied for Disability Insurance and SSI benefits on May 16, 2011. (Doc. 13, tr., at 14, 168-169.)  Baker had listed the conditions that limit her ability to work as "stroke, weakness on right side, shoulder injury."  (Tr., at 232.)

Baker alleged her disability began in May 2007, when she injured her shoulder in a workplace incident.  (Doc. 13, tr., at 17, 40, 44, 86, 98, 232.)  A December 2008 x-ray of Baker's cervical spine showed disk space narrowing.  A September 2009 x-ray of the cervical spine revealed moderate degenerative changes.  (Doc. 16, at 1, citing tr., at 605, 560.)

Baker has had a history of shoulder pain since May 2009.  She received physical therapy for bilateral shoulder pain and rotator cuff impingement at that time.  (Doc. 16, at 1, citing tr., at 570.)  In September 2009, Baker visited the E.R. complaining of acute left shoulder pain and numbness.  (Doc. 16, at 1, citing tr., at 551.)  In January 2010, Baker continued to complain of shoulder pain, greater on the left side.  She was assessed with bilateral shoulder tendinitis, and C5-6 cervical radiculopathy.  She was sent for additional physical therapy, and was prescribed Percocet.  (Doc. 16, at 1-2, citing tr., at 380-381.)

_____

[2] The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.

5

Baker continued to suffer from shoulder pain throughout early 2010, and continued to receive physical therapy.  She complained of numbness in both hands, and reduced grip strength in her hands.  (Doc. 16, at 2, citing record.)  In May 2010, Baker was taking prescription Neurontin as well as Percocet.  (Doc. 16, at 2, citing tr., at 378.)

On June 23, 2010, Baker reported to the E.R., complaining of numbness on the right side of her face and right-sided paresthesia.  (Doc. 16, at 3, citing tr., at 494, 492.)  A CT scan showed thalamic and lacunar infarcts, that is, stroke.  (Tr., at 494, 498.)  Baker was admitted to the hospital, and then transferred to University Hospitals.  (Tr., at 494, 295.)

Baker was an inpatient at University Hospitals from June 24, 2010, until July 2, 2010.  (Doc. 16, at 3, citing tr., at 295.)  An MRI of her brain confirmed evidence of stroke.  (Tr., at 304.)  Her discharge summary indicated a primary diagnosis of bilateral occipital embolic stroke.  Secondary diagnoses included multiple masses on chordal papillary of tricuspid valve (unknown etiology); dyslipidemia; chronic pain; history of supraventricular tachycardia; iron deficiency anemia; thrombocytosis; and anxiety disorder.  Baker had normal language, but decreased sensation on the right side of her body.  (Tr., at 296.)

Baker received physical, occupational, recreational, and speech therapy at Euclid Hospital during the period of July 2 to July 15, 2010.  (Doc. 16, at 3, citing record.)  Baker was placed on medications for pain and sleep, as well as antidepressants, iron supplements, anticoagulants, anti-lipid drugs, and anti-

6

hypertensives.  Baker was adjudged stable and discharged on July 15, with the following recommendations for activity: "May resume walking, showering.  No driving, lifting." (Tr., at 350.)

Baker visited Paul Hanahan, M.D., on follow-ups for her bilateral shoulder pain in the summer and fall of 2010.  Baker continued to suffer shoulder pain, and her range of motion was restricted.  In July, Dr. Hanahan reported that she was using a walker, and that she was showing weakness on the right side of her body. (Doc. 16, at 4, citing tr., at 377.)  Dr. Hanahan noted that Baker had received narcotic prescriptions from four different doctors.  He directed that the narcotic prescriptions from his office would be held until the previous prescriptions had been used.  (Tr., at 377.)

On August 4, 2010, Baker was admitted to Lake West Hospital overnight. She appeared at the E.R. complaining of burning pain on the right side of her leg, and some weakness.  She was admitted to the hospital overnight.  A CT scan and a repeat CT scan did not show any new stroke.  Baker was treated for pain management and discharged with her usual medication.  (Doc. 16, at 4, citing tr., at 470.)  She was referred to Dr. Parr for pain management because of thalamic pain syndrome.  (Tr., at 470.)

On August 9, 2010, Sophia Sundararajan, M.D., provided an update to Dr. Martin Fernandes, Baker's primary care doctor, on Baker's treatment at the Stroke Clinic.  (Doc. 16, at 4, citing tr., at 652-653.)  Dr. Sundararajan noted the existence of multiple masses on the tricuspid valve, for which she was evaluated by

cardiology.  However, Dr. Sundararajan felt that Baker was not compliant enough to recommend Coumadin therapy.  Although Baker was better since her discharge from University Hospitals, the doctor noted that Baker continued to have a lot of difficulty with mobility.  (Tr., at 652.)  Motor exam revealed 4+/5 strength in the left leg, and 5/5 in the arms.  Baker drags her right leg when she is walking.  The doctor adjusted her medications, reviewed the warning signs of stroke, and discussed the importance of losing weight and eating plenty of fresh fruits and vegetables.  (Tr., at 653.)

Dr. Sundararajan provided another update to Dr. Fernandes on October 18, 2010.  The doctor reported that Baker complained of persistent and "perhaps even increasing" dysesthesias on her right arm and especially her right leg.  She had been wearing mostly loose-fitting clothing because it hurt when her clothing touched her leg.  Also, she had been doing fewer things around the house, including cooking, because it hurt to use her hand.  (Doc. 13, at 5, citing tr., at 650.)  Dr. Sundararajan noted that Baker's gait was slower than one might expect "but dramatically improved from her last visit when she was requiring a walker."  (Tr., at 650.)  Dr. Sundararajan assessed Baker as developing a thalamic pain syndrome, which can be very difficult to treat, causing pain on her right side.  (Doc. 16, at 5, citing tr., at 651.)

On November 19, 2010, David Demangone, M.D., of the Cleveland Back & Spine Institute, reported to Dr. Hanahan concerning the referral for a consultation

about Baker's chronic right leg pain complaints.  Dr. Demangone[3] offered the opinion that Baker had significant myofascial pain, and it was unclear whether she had an underlying central pain syndrome as well.  (Doc. 16, at 5, citing tr., at 382.) Dr. Demangone suggested placing Baker on methadone, which would give her longer relief than percocet, and that asking that Baker agree to have Dr. Demangone solely manage her pain medications.  (Tr., at 382.)

Baker had follow-up appointments with Dr. Hanahan in December 2010, February 2011, and May 2011, and continued to have bilateral shoulder pain, with restricted range of motion.  She had reduced grip strength in both hands, and was assessed with bilateral shoulder tendonitis.  (Doc. 16, at 5-6, citing record.)

Dr. Sundararajan provided further updates to Dr. Fernandes on February 23, and April 11, 2011.  (Doc. 16, at 6, citing record.)  In February, she reported that Baker's walking was "much better," and she was no longer using a walker or cane. Baker reported that she was no longer cooking in her home, after an accident where her shirt caught fire.  (Tr., at 648.)  The neurologic exams showed normal language and speech, both in February and April.  (Tr., at 646, 649.)  In addition, motor exams revealed 5/5 strength throughout.  Gait was fairly normal.  (Tr., at 647, 649.) At the February visit, Baker complained of some blurred vision on the right occasionally.  (Tr., at 649.)

---

[3] In Baker's brief, Baker refers to the physician writing the Nov. 19 letter as Dr. Kutsikovich.  Reference to the record shows the author to be Dr. Demangone.  See tr., at 382.

9

On July 15, 2011, Baker met with Dr. Demangone for a pain management follow-up.  (Doc. 16, at 6-7, citing tr., at 664.)  She met with Dr. Demangone again on September 14, 2011, October 21, 2011, and November 16, 2011.  (Doc. 16, at 7, citing tr., at 661-663.)  At the September appointment, Baker reported having numbness on the right side of her face, and a pins and needles sensation in her right leg.  (Tr., at 663.)  At all these visits, Baker consistently complained of pain in her right leg and lower back.  Dr. Demangone's diagnosis was myofascial pain and cervical radiculitis.  See, e.g., tr., at 661.

### A.  Opinion Evidence

A psychological evaluation was conducted by Richard L. Barnett, Ph.D., on February 3, 2011.  (Doc. 16, at 8, citing tr., at 363-369.)  "She arrived promptly for the exam, having driven herself."  (Tr., at 363.)  Baker reported that she had a hard time with daily activities.  She said she dropped objects because of numbness in her fingers, and said she is lethargic most of the time.  (Doc. 16, at 8, citing tr., at 363.)  Baker reports that she sees friends on a regular basis, but they visit her because she can't get out.  She attends church weekly and it is a very important part of her life.  (Tr., at 365.)  She eats breakfast, but it is too hard for her to fix lunch.  Her daughter will often prepare her dinner.  She usually spends the entire day watching television.  (Tr., at 366.)  Baker's long term memory was found to be intact, although her short-term memory was moderate; she had some difficulties with focus and concentration.  (Tr., at 366.)

10

Psychological testing suggested a severe level of depression, although Dr. Barnett noted that chronic physical pain can intensify the scores.  (Tr., at 367.)  His diagnosis was Major Depressive Disorder, Single Episode, Moderate, which he opined was the direct result of her 2007 workplace injury.  (Tr., at 367-368.)  "There is no evidence Ms. Baker is malingering her depressive symptoms."  (Tr., at 368.)  The psychologist opined that the major depression alone prevents Baker from returning to her position as a teacher's aide.  (Tr., at 369.)

A functional capacity examination was conducted by a physical therapist, Jonathan Strychasz, on March 31, 2011.  (Doc. 16, at 7-8, citing tr., at 384-388.)  Strychasz reported:  "Overall test findings, in combination with clinical observations, suggest the presence of sub-maximal effort on Ms. Baker's behalf."  Strychasz stated that "Baker can do more physically at time than was demonstrated during this testing day."  (Tr., at 384.)  The PT provided specific examples as support for his finding.  (Tr., at 385.)  He also found "some minor inconsistency to the reliability/accuracy of Ms. Baker's subject reports of pain/ limitation," although he also noted that her subjective reports generally matched well with distraction-based clinical observations.  (Tr., at 384.)

Although Strychasz provided a list of physical abilities and limitations, he pointed out that the abilities and limitations on the table should be viewed as "what she demonstrated today, but do not necessarily reflect what she is capable of performing," in light of her low effort.  (Tr., at 386.)  The PT found that Baker was functioning in the less than sedentary to sedentary physical demand level, on that

11

day, but in light of her low effort, that "may not be a true assessment of her physical abilities." (Tr., at 386.)

Dr. Sundararajan responded to a request for information from the state agency on August 3, 2011. (Doc. 16, at 8, citing tr., at 643-645.) Dr. Sundararajan reported treating Baker since June 2010, and as recently as April 2011. She gave her diagnosis as ischemic stroke and thalamic pain syndrome. Dr. Sundararajan noted that the thalamic pain syndrom was responding to high dose neurontin. She noted that Baker had decreased sensation on the right side, but no motor deficits. (Tr., at 644.) Dr. Sundararajan reported that Baker's compliance with her medication regime was good, and the response to the medications was good. (Tr., at 645.)

In response to an inquiry concerning any limitations that Baker's impairments impose on her ability to perform sustained work activity, Dr. Sundararajan reported:

> Ms. Baker may fatigue more quickly and certain activities may aggravate her pain. She should be able to sit, stand, walk. Bending, stooping, grasp should be ok if not done continuously or frequently. She should be able to relate to others/ follow instructions. Cares for herself independently.

(Tr., at 645.)

Dr. Fernandes wrote a letter[4] dated January 24, 2012, concerning Baker. (Tr., at 670.) Dr. Fernandes indicates that he has been treating Baker since 2009.

---

[4] Unfortunately, only the first page of the letter is in the record. (Tr., at 670.)

12

He states that, as a result of her June 2010 stroke, Baker experienced a right-sided hemiplegia.  He reports that Baker has "ongoing loss of sensory regulation and right arm & leg dyesthesias with unsteady gait."  Also, he says that Baker has been experiencing continuing difficulties with speech and in memory, and has chronic thalamic pain syndrome.  In September 2011, Baker had a total abdominal hysterectomy.  (Tr., at 670.)

Dr. Fernandes offered the medical opinion that Baker should be considered medically disabled.  He stated:

> Due to her ongoing sensory & motor deficits as well as the speech and memory difficulties she continues to experience, she is unable to be employed.  Although she has shown some . . .

(Tr., at 670.)  After the introductory phrase indicating some qualification of her conditions or limitations, the rest of the letter is missing from the record.


## IV.  TESTIMONY OF VOCATIONAL EXPERT

At the hearing, the vocational expert Borgeson provided testimony.  (Doc. 13, tr., at 32, 67-73.)  Borgeson testified that Baker had past relevant work as a babysitter (child monitor); a teacher's aide; and, a mental retardation aide.  (Tr., at 69-70.)

The ALJ posed a hypothetical question concerning an individual with Baker's same age, education, and work history, who could perform the limited range of light work, with no climbing of ladders, ropes, or scaffolds, but occasional climbing of ramps and stairs.  No work in unprotected heights, or around dangerous machinery,

13

and no commercial driving.  The person could do occasional balancing, stooping, kneeling, crouching, or crawling.  The person could do frequent handling, with the right hand.  The person can perform simple and more complex tasks, in an environment with routine changes.  Frequent contact with the general public, coworkers, and supervisors.  The individual would have to be employed in a setting without frequent interruptions.  The individual would be off task five percent of the time.  The ALJ asked  Borgeson whether such a hypothetical individual could do any of the past work of Baker, to which the VE answered, "No."  (Tr., at 71.)

The ALJ then asked whether there was other work that this hypothetical person could do.  Borgeson responded that there would be unskilled work, at the light level.  (Tr., at 71.)

Borgeson mentioned a Cashier II, simple cashiering, unskilled and light in physical demand, at the SVP 2 level.  DOT number is 211.462-010.  There are approximately 12,000 such jobs in northeast Ohio, over 50,000 in the state, and about one million nationally.  A second job would be a folder, in the cleaning or laundry industry, which is also light and unskilled, at the SVP 2 level, DOT number 589.687-014.  The VE testified there were 3,000 such jobs in northeast Ohio, over 20,000 in the state, and approximately 394,000 nationally.  A third job would be mail clerk (not post office), again light, unskilled, SVP level 2, with the DOT number of 209.687-026.  Borgeson said there were about 1,400 jobs in northeast Ohio, over 7,000 in the state, and about 139,000 nationally.  (Tr., at 72.)

14

The ALJ then presented Borgeson with a second hypothetical, which would keep all the limitations of the first, except changing light to sedentary, and the sit to stand option to every hour.  The VE responded that this (second) hypothetical person could not do any of the past work either.  (Tr., at 72.)

In response to the query of what type of work the second hypothetical person could do, Borgeson mentioned that, speaking of unskilled work at the sedentary level, one position could be an order clerk, in the food and beverage industry, which is classified as sedentary and unskilled, at the SVP 2 level, with the DOT number 209.567-014.  There are about 1,800 such jobs in northeast Ohio, over 9,000 in the state, and about 215,000 nationally.  (Tr., at 72-73.)

Another position mentioned by the VE was a general office clerk, such as a charge account clerk, sedentary, unskilled, SVP level 2, with DOT number 205.367-014.  There are 2,100 jobs in northeast Ohio, over 10,000 in the state, and about 220,000 nationally.  Borgeson also said the hypothetical person could work as a table worker, an inspection job.  That is sedentary, unskilled, SVP level 2, DOT number 739.687-182.  There are about 1,000 jobs in northeast Ohio, 5,000 statewide, and about 102,000 nationally.  (Tr., at 73.)

The ALJ next presented the vocational expert Borgeson with a third hypothetical, which would keep all the limitations of the second, except to change the off-task percentage from 5 percent to 20 percent.  Recognizing that there's no past work, the ALJ queried whether there was other work this hypothetical person

15

could do.  Borgeson responded that she did not believe such a person would be able
to sustain full time work.  (Tr., at 73.)

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his
November 16, 2012, decision:

> 1.  The claimant meets the insured status requirements of the Social
> Security Act through December 31, 2013.

> 2.  The claimant engaged in substantial gainful activity during the
> following periods:  claimant earned $12,467.00 in 2011 (20 CFR
> 1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

> 3.  However, there has been a continuous 12-month period(s) during
> which the claimant did not engage in substantial gainful activity.

> 4.  The claimant has the following severe impairments:  status/post
> cerebrovascular accident; shoulder sprain; and major depressive
> disorder (20 CFR 404.1520(c) and 416.920(c)).

> 5.  The claimant does not have an impairment or combination of
> impairments that meets or medically equals the severity of one of the
> listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
> CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and
> 416.926).

> 6.  After careful consideration of the entire record, the undersigned
> finds the claimant has the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a),
> except she must have the option to sit/stand every hour; she cannot
> climb ladders, ropes scaffolds; she can occasionally climb ramps/stairs;
> she cannot work around unprotected heights; she cannot work around
> dangerous machinery; she cannot do commercial driving; she can do
> occasional balancing, stooping, kneeling, crouching, crawling; frequent
> handling with the right hand; can perform simple to more complex
> tasks environment with routine changes; frequent contact with the

16

general public, co-workers, supervisors; setting without frequent interruptions; she will be off task 5% of the time.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on March 1, 1966, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from May 22, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. 13, tr., at 19-21, 24-25.)


## VI. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. See 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." See 20 C.F.R. §§ 404.1505, 416.905.

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed. Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983). This court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited

18

in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human

Servs., 884 F.2d 241, 245 (6th Cir. 1989).


## VIII.  ANALYSIS

Baker briefs six issues for review:

1.  Whether the ALJ's decision is supported by substantial evidence
having omitted cervical radiculopathy and thalamic pain syndrome as
a severe impairment at Steps 2 and thereafter throughout the
sequential analysis.

2.  Whether the ALJ committed an error of law by not considering
Listings 11.04 for the diagnosis of a stroke and 1.04 for cervical
radiculopathy at Step 3.

3.  Whether the ALJ erred by not consulting a medical expert when
considering whether Hope met or equaled any of the listings of
impairments.

4.  Whether the ALJ properly evaluated the treating source opinion of
Dr. Sundararajan.

5.  Whether the ALJ's RFC finding is supported by substantial
evidence and whether the RFC finding was made following the
requirements of SSR 96-8p based on the limitations imposed by
Plaintiff's cerebrovascular accident, bilateral shoulder injuries,
thalamic pain syndrome, cervical radiculopathy, depression, and other
impairments.

> [a.]  Whether the ALJ's RFC finding is supported by
> substantial evidence when it lacks any reference or
> accommodation for hand-held assistive devices, despite
> substantial evidence supporting Plaintiff's use of the
> same throughout the relevant time-frame.

> [b.]  Whether the ALJ's RFC finding is supported by
> substantial evidence considering the treating medical
> source opinion of Dr. Sundararajan limiting Plaintiff to

less than frequent sitting, standing, walking, bending,
stooping, and grasping.

6.  Whether the ALJ's credibility finding is supported by substantial
evidence and whether it complies with the directives of SSR 96-7p.

(Doc. 16, at [ii].)


### A.  Missing severe impairments

The first issue raised by Baker is:  "Whether the ALJ's decision is supported
by substantial evidence having omitted cervical radiculopathy and thalamic pain
syndrome as a severe impairment at Steps 2 and thereafter throughout the
sequential analysis."  "Cervical radiculopathy" refers to a disease of the cervical
nerve roots, often manifesting as neck or shoulder pain.  Mosby's Medical
Dictionary, at 331 (9th ed. 2013).  The Commissioner provides a definition of
"thalamic pain syndrome" from the NIH, a neurological disorder in which the body
becomes hypersensitive to pain as a result of damage to the thalamus, the region of
the brain that affects sensation.  (Doc. 19, at 5 n.1, citing NIH website.)  "Thalamic
pain syndrome" is also defined as pain affecting one half of the body that results
from a stroke or other injury to the thalamus.  Taber's Cyclopedic Medical
Dictionary, at 2300 (22nd ed. 2013).

More specifically, Baker asserts that the ALJ completely omitted the severe
impairments of thalamic pain syndrome and cervical radiculopathy from
consideration in his analysis.  As Baker details in her brief, diagnoses of both
thalamic pain syndrome and cervical radiculopathy are well-documented by

20

substantial medical evidence in the record.  (Doc. 16, at 15-16, citing tr., at, e.g.,
650-651, 644, 380, 661.)

Baker argues that there are no references to these medical conditions at any
step of the sequential analysis in the ALJ's decision, yet these impairments are
severe and result in functional limitations.  (Doc. 16, at 16.)  Baker contends that
the ALJ's failure to discuss these severe impairments, and the resulting functional
limitations, establishes that the decision is not supported by substantial evidence,
and should be subject to remand.  (Doc. 16, at 16; doc. 20, at 2-3.)

The Commissioner responds that the real issue is not whether the individual
impairments are severe, but whether the ALJ considered the functional limitations
resulting from all of a claimant's limitations at the remaining steps of the
sequential evaluation process.  (Doc. 19, at 9-10, citing Maziarz v. Secretary, HHS,
837 F.2d 240, 244 (6th Cir. 1997).)  The Commissioner contends that the ALJ
considered all of the evidence, and reasonably evaluated the combined effects of
Baker's impairments on her ability to work.  Id. at 10.

The Commissioner argues that, because the ALJ found that "status/ post
cerebrovascular accident" was a severe impairment, the court should infer that the
ALJ considered all of Baker's residual conditions and symptoms caused by the
stroke, including thalamic pain syndrome.  The Commissioner finds evidence
supporting  this inference in the ALJ's discussion of Baker's "numbness and
heaviness symptoms" improving with medication.  The Commissioner also
references the ALJ's discussion of the lack of sensory or motor deficits, and Baker's

21

ability to move and use her limbs. (Doc. 19, at 10.) However, none of these symptoms relate directly to the hypersensitivity to pain which characterizes thalamic pain syndrome, and thus the court cannot find an indication in the ALJ's discussion that the ALJ considered this syndrome.

The Commissioner relies, in part, on Maziarz (doc. 19, at 10), in which the Sixth Circuit:

> . . . found it "unnecessary to decide" whether the ALJ erred in failing to find that the claimant's cervical condition constituted a severe impairment at step two because the ALJ continued with the remaining steps of the sequential evaluation process and considered the plaintiff's cervical condition in determining whether he retained a sufficient residual functional capacity to allow him to perform substantial gainful activity. Therefore, the Court concluded that any alleged error at step two was harmless. As long as the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to find additional severe impairments at step two "[does] not constitute reversible error."

Meadows v. Commissioner, No. 1:07CV1010, 2008 WL 4911243, at *13 (S.D. Ohio Nov. 13, 2008) (discussing Maziarz, 837 F. 2d at 244).

The court in Meadows distinguished Maziarz from the situation before the court, stating it was not clear that the ALJ considered the claimant's particular impairment at the other steps of the sequential process. Meadows, 2008 WL 4911243, at *13. Unlike in Maziarz, there was no indication that the ALJ addressed or included any limitations arising from that impairment in determining the claimant's RFC. Id. The court would not infer from a silent record that the ALJ considered the impairment in rendering the RFC, and found that the ALJ's failure to fully consider the impairment in determining the RFC required reversal and

22

remand.  Meadows, 2008 WL 4911243, at *13; see also Stephens v. Astrue, No. 09-55-JBC, 2010 WL 1368891, at *2 (E.D. Ky. March 31, 2010) (same); Jamison v. Commissioner, No. 1:07CV152, 2008 WL 2795740, at *9 (S.D. Ohio July 18, 2008) (same).

The court finds that the ALJ's failure to address the severity of, or to include any limitations from, Baker's thalamic pain syndrome in determining her RFC is not harmless error, which requires the case to be reversed and remanded for further development and clarification of Baker's thalamic pain syndrome on her ability to work.  Stephens, 2010 WL 1368891, at *2; Meadows, 2008 WL 4911243, at *13.

As to cervical radiculopathy, although the ALJ does not refer specifically to the condition by this name, the ALJ does include "shoulder pain" as a severe impairment.  (Tr., at 19.)  As noted above, cervical radiculopathy often manifests itself as neck or shoulder pain, thus the court finds that the ALJ did account for Baker's cervical radiculopathy, as it affected her.

However, as to Baker's thalamic pain syndrome, the court finds that the first allegation of error has merit.

### B.  Whether Impairment(s) Met or Equaled a Listing

The second issue raised by Baker is:  The ALJ committed an error of law at Step 3 as he never addressed whether [Baker's] medical history and stroke in June of 2010 met or equaled listing 11.04 or whether her cervical radiculitis met or equaled listing 1.04."  (Doc. 16, at 16.)  Baker states that the ALJ must evaluate all

23

the medical evidence, and compare it to the requirements for the listed impairment(s). (Doc. 16, at 16, citing Reynolds v. Commissioner, No. 09-2060, 2011 WL 1228165 (6th Cir. Apr. 1, 2011).)

In the third step, it is claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. An impairment or combination of impairments is considered medically equivalent to a listed impairment "if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." Ridge v. Barnhart, 232 F.Supp.2d 775, 788 (N.D. Ohio 2002) (quoting Land v. Secretary, HHS, 814 F.2d 241, 245 (6th Cir. 1986) (per curiam)).

Baker notes that Listing 11.04 concerns evidence of a central nervous system vascular accident and resulting symptoms, and points to record evidence which establishes that Baker had a cerebrovascular accident, which affected coordination and sensation, and use of her right arm and leg. (Doc. 16, at 17, citing tr., at 377, 470, 650, and 653; see also doc. 16, at 15.)

Baker also points out that Listing 1.04 addresses disorders of the spine, including the diagnosis of cervicular radiculitis. (Doc. 16, at 17.) Baker cites record evidence of her cervicular radiculitis. (Doc. 16, at 15-16.) Baker contends that Listing 1.04 is also not discussed in the ALJ's decision.

At Step 3, the ALJ found that the severity of Baker's mental impairment (i.e., "major depressive disorder") did not meet or medically equal the criteria of Listing 12.04. (Tr., at 20-21.) The ALJ did not address whether any of Baker's physical

24

impairments met or equaled a listing.  The ALJ had earlier found that Baker had "status/post cerebrovascular accident," as well as shoulder sprain.  (Tr., at 19.) Neither of those impairments were discussed in relation to whether either met or equaled a listing.  (Tr., at 20-21.)  Specifically, the ALJ did not address whether Baker's cerebrovascular accident met or equaled Listing 11.04, nor did he address whether her cervicular radiculitis (resulting in shoulder pain) met or equaled Listing 1.04.  (Tr., at 20-21.)

Where the ALJ's decision does not discuss a Listing, the court must determine whether the record evidence raises a substantial question as to the claimant's ability to satisfy each requirement of the Listing.  Smith-Johnson v. Commissioner, No. 13-1696, 2014 WL 4400999, at *6 (6th Cir. Sept. 8, 2014).  Baker "must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing."  Id.  Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a Listing at Step 3.  Id.

Here, Baker does point to some evidence in the record which she contends could support a finding of disability through meeting or equaling Listing 11.04, as noted above, as well as Listing 1.04.  (Doc. 16, at 15-17.)  Yet Baker notes that the ALJ did not provide an analysis of her limitations under either Listing 11.04 or 1.04.  Id.

The Commissioner responds that an ALJ is only required to minimally articulate his reasoning at Step 3. (Doc. 19, at 11.)  The Commissioner contends

that the ALJ addressed each element of Listing 11.04 (stroke) while discussing
Baker's RFC.  (Doc. 19, at 12.)

In addition, the Commissioner states the ALJ reasonably relied on the state
agency reviewing physicians' opinions to determine that Baker did not meet or
medically equal a listing.  (Doc. 19, at 12.)  However, in his opinion the ALJ never
asserts that the state agency reviewing physicians' opinions were relied on for this
determination, because the ALJ never addressed the listings in any manner.

In Hunter v. Astrue, "the record reflects that the ALJ failed to evaluate the
medical evidence and compare it to the requirements for the listed impairment."
Hunter v. Astrue, No. 1:09CV2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20,
2011).  The court pointed out that the Sixth Circuit, in Reynolds, 2011 WL 1228165,
at *3, found an ALJ had erred where the ALJ failed to analyze the claimant's
physical condition in relation to the listed impairments.  Hunter, 2011 WL 6440762,
at *3.

Although it is the claimant's burden of proof at Step 3, the ALJ must provide
articulation of his Step 3 findings that will permit meaningful review.  Woodall v.
Colvin, No. 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013).  This
court has stated that "the ALJ must build an accurate and logical bridge between
the evidence and his conclusion."  Woodall, 2013 WL 4710516, at *10 (citations
omitted).  In Woodall, although the ALJ stated that all listings were considered in
reaching the Step 3 finding, including a particular relevant listing,

26

> . . . the ALJ failed to discuss those Listings and failed to compare them with the evidence of record to show how he determined that Claimant's impairments did not meet or medically equal any of the Listings. He also indicated that he considered the opinions of the state agency medical consultants, but he did not discuss their findings or opinions in the context of the meets or equals analysis.

Woodall, 2013 WL 4710516, at *10.

The court also discussed the Reynolds decision, and noted that the Sixth

Circuit found:

> In short, the ALJ needed to actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

Woodall, 2013 WL 4710516, at *11 (quoting Reynolds, 2011 WL 1228165, at *4).

Woodall noted that courts in this district have applied Reynolds to remand cases

"where the ALJ provided only a conclusory statement and failed to conduct a

meaningful Step Three analysis that compares the medical evidence to the

applicable listing and provides an 'explained conclusion' as to why a claimant's

impairments failed to meet or equal a Listing."  Woodall, 2013 WL 4710516, at *11

(citing cases); see also Marok v. Astrue, No. 5:08CV1832, 2010 WL 2294056, at *4

(N.D. Ohio June 3, 2010) (courts have repeatedly remanded cases when ALJ fails to

articulate meaningful discussion of Listings or related criteria).  Here, the ALJ did

not provide a conclusory statement – he failed to even mention any of the applicable

listings regarding Baker's physical impairments; he only analyzed her mental

impairment at Step 3.  (Tr., at 20-21.)

27

The court in Woodall rejected the Commissioner's contention that the ALJ's functional equivalence analysis provided a basis for upholding the Step 3 finding. The court pointed out that a number of courts in this Circuit have held that an ALJ's functional equivalence analysis does not provide an adequate substitute for the deficient Step 3 analysis.  Woodall, 2013 WL 4710516, at *11-*12 (citing cases).

At no point did the ALJ specifically discuss the elements of Listing 11.04 or 1.04, the specific evidence relevant to the Listing(s), and why he determined that evidence failed to satisfy the severity requirements of the Listing(s).  As Baker points out, there are arguably elements of the Listings in the record, yet the ALJ does not address them.  The court finds that the second allegation of error has merit.  The ALJ's decision should be vacated and remanded for a more thorough Step 3 determination.

## C.  Medical expert

As to her third claim, Baker argues that the ALJ erred by not consulting a medical expert when considering whether Baker met or equaled any of the listings of impairments and for determining an RFC.  (Doc. 16, at 18.)

The court finds no indication in the record, and Baker points to no evidence, that Baker requested that the ALJ consult a medical expert.  See generally Simpson v. Commissioner of Social Sec., No. 08-3651, 2009 WL 2628355, at *7 (6th Cir. Aug. 27, 2009) (without any request from claimant or counsel for medical expert testimony, ALJ reasonably concluded record was complete).

In Long, this court pointed out that an ALJ is not required to call a medical expert.  Long ex rel. D.C.P. v. Commissioner of Soc. Sec. Admin., No. 1:13CV576, 2014 WL 1333270, at *14 n.28 (N.D. Ohio Mar. 28, 2014).  See also Simpson, 2009 WL 2628355, at *8 (ALJ has discretion whether to call medical expert or not); Davis v. Chater, 104 F.3d 361, 1996 WL 732298, at *2 (6th Cir. 1996) (TABLE, text in WESTLAW) (per curiam) (ALJ's failure to call medical expert does not prevent finding that substantial evidence supports ALJ's decision); O'Neill v. Colvin, No. 1:13CV867, 2014 WL 3510982, at *18 (N.D. Ohio July 9, 2014); Touart v. Commissioner of Social Sec. Admin., No. 1:12CV0733, 2013 WL 2185848, at *15 (N.D. Ohio May 21, 2013) (ALJ  not required to call medical expert).  Where the record contains sufficient evidence for the ALJ to decide a disability claim absent expert medical testimony, failure to call a medical expert will not support remand. Long, 2014 WL 1333270, at *14 n.28.  See also O'Neill, 2014 WL 3510982, at *18; Touart, 2013 WL 2185848, at *15.

The court finds that the ALJ had before him a full and complete medical record, which contained sufficient evidence for the ALJ to decide Baker's disability claim absent expert medical testimony.  Because the court is recommending remand to address the medical conditions and the related listings as discussed above, the ALJ will have the opportunity to consider anew whether the assistance of a medical expert is desirable.  At this point, however, the ALJ's decision should not be reversed on this basis.

29

### D.  Treating Source Opinion

The fourth issue raised by Baker is that the ALJ's finding to give less than controlling weight to the opinion of Dr. Sundararajan is not supported by substantial evidence, and was made without following the directives of SSR 96-2p. (Doc. 16, at 19.)  Baker points out that Dr. Sundararajan began treating her in June 2010, in connection with her stroke and related medical issues.  (Doc. 16, at 20.)

One sub-part of her fifth issue is related to the discussion here as well: "Whether the ALJ's RFC finding is supported by substantial evidence considering the treating medical source opinion of Dr. Sundararajan limiting Plaintiff to less than frequent sitting, standing, walking, bending, stooping, and grasping."  (Doc. 16, at ii, 23.)  Baker contends that the ALJ's RFC does not include a limitation on frequent sitting, and fatigue.  (Doc. 16, at 23.)

Dr. Sundararajan's August 2011 opinion was that:

> Ms. Baker may fatigue more quickly and certain activities may aggravate her pain.  She should be able to sit, stand, walk.  Bending, stooping, grasp should be ok if not done continuously or frequently. She should be able to relate to others/ follow instructions.  Cares for herself independently.

(Tr., at 645.)  Baker misreads this opinion to proscribe frequent sitting, standing, and walking, by construing the second and third sentences above as a single sentence.  (Doc. 16, at 20.)

However, as read by the court, there is a period after "... sit, stand, walk" and the next phrase begins "Bending, stooping [etc.]" with a capital B.  See tr., at 645. In other words, Dr. Sundararajan's opinion should be read as limiting bending,

30

stooping and grasping, without imposing limits on sitting, standing or walking.
[For the contrast between the doctor's written upper case and lower case B, see tr.,
at 644, ¶ 3 ("... Baker had bilateral ...").  Clearly, there are two sentences in the
August 2001 opinion quoted above, not a single sentence.]

> The ALJ discussed Dr. Sundararajan's opinion as follows, in part:
>
> . . . In April 2011, the claimant visited with her neurologist, who
> submitted a summary and report . . . Dr. Sundararajan noted that the
> claimant had a cryptogenic stroke, possibly related to strands on her
> tricuspid valve . . . The doctor relate[d] also, as the claimant reported,
> that the Neurontin medication helps with the numbness and heaviness
> symptoms when she takes it properly.
>
> Overall, however, Dr. Sundararajan notes that the claimant, while she
> has decreased sensation on the right side, she  does not have motor
> deficits.  The doctor also states that the claimant had a good response
> to medication and can sit, stand, walk, bend, stoop, and grasp without
> a problem if the [sic] not performed continuously or frequently (i.e. no
> frequent bending).  She can relate to others, follow instructions, and
> care for herself independently.  The undersigned affords some weight
> to Dr. Sundararajan's opinion, because it is based on a limited window
> of treatment of the claimant; however, the opinion supports that the
> claimant is improved with medication and that the claimant is not as
> limited as she alleges.

(Tr., at 22.)

Baker contends that the ALJ's RFC finding did not give any weight to "Dr.
Sundararajan's opinion precluding frequent or continuous sitting, standing, and
walking, including that [Baker] tires easily."  (Doc. 16, at 20-21.)  As discussed
above, this argument is based, in part, on a misreading of Dr. Sundararajan's
opinion.

31

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians. Gayheart v. Commissioner, 710 F.3d 365, 375 (6th Cir. 2013); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history.  Id.; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  Gayheart, 710 F.3d at 376 (citing  20 C.F.R. § 404.1527(c)(2)); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  In other words, treating physicians' opinions are only given deference when supported by objective medical evidence.  Vance v. Commissioner of Social Security, No. 07-5793, 2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008) (citing Jones v. Commissioner, 336 F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  Gayheart, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(1) -(6), 416.927(c)(1)-(6).  Social Security regulations require the ALJ to give good reasons for discounting evidence of disability

32

submitted by the treating physician(s).  Blakley, 581 F.3d at 406; Vance, 2008 WL 162942, at *3.  Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Winning v. Commissioner, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

Remand may be appropriate when an ALJ fails to provide adequate reasons explaining the weight he assigned to the treating source's opinions, even though "substantial evidence otherwise supports the decision of the Commissioner." Kalmbach v. Comm'r of Soc. Sec., No. 09-2076, 2011 WL 63602, at *8 (6th Cir. Jan. 7, 2011) (quoting Wilson, 378 F.3d at 543-46).

Although Baker argues that the ALJ failed to give Dr. Sundararajan's opinion controlling weight, the court finds that the ALJ provided adequate reasons in his decision for that weight, and for determining Baker's RFC as he did. Reviewing Dr. Sundararajan's opinion, it is apparent that the ALJ adopted most of the specific limits set forth therein.  The ALJ provided good reasons for the weight he assigned to Dr. Johnson's opinion, and the RFC took account of the limits proposed regarding bending, stooping, and the like.  As the Commissioner notes (doc. 19, at 16-17), the ALJ adopted the limits of the second hypothetical, that is, the sedentary level, with sit to stand option every hour, which takes into account the factor of tiring easily, as well as no more than occasional bending or stooping. (Tr., at 71-73 (second hypothetical), 24-25, 645.)

The court finds that the ALJ's decision concerning the weight given to Dr. Sundararajan's opinion is supported by good reasons and by substantial evidence in the record.  The fourth alleged error, and the sub-part of the fifth claim discussed above, should be overruled.

### E.  RFC Determination

The fifth claim challenges the ALJ's RFC finding as "not supported by substantial evidence and was derived without following the requirements of SSR 96-8p based on the limitations imposed by [Baker's] cerebrovascular accident, bilateral shoulder injuries, thalamic pain syndrome, cervical radiculopathy, depression, and other impairments."  (Doc. 16, at 21.)  Baker contends that the RFC finding is not supported by substantial evidence as it lacks inclusion of Baker's limitations arising from those conditions, and limitations provided by Dr. Sundararajan.  (Doc. 16, at 21-22.)

Specifically, Baker focuses on two issues.  The second, concerning the alleged limitations set forth by Dr. Sundararajan, doc. 16, at 23, has already been discussed above.  The other issue is that the RFC finding is lacking "any reference or accommodation for hand-held assistive devices, despite substantial evidence supporting [Baker's] use of the same throughout the relevant time-frame."  (Doc. 16, at 22-23.)

Baker claims that she was prescribed a walker, and used a cane since her stroke in June 2010.  Baker notes there is "no reference to an ambulatory aide in

34

the RFC finding, and substantial evidence does not support its absence." (Doc. 16, at 23.)  However, Baker does not point to any substantial medical evidence which would support the inclusion of a cane or walker in the RFC.

In July 2010, Baker was using a walker at a visit to Dr. Hanahan. (Tr., at 377.)  He does not report having prescribed one for her.

The ALJ did mention that Baker used a walker in connection with her physical therapy. (Doc. 19, at 16; see tr., at 22.)  At her physical therapy appointment on August 4, 2010, it is recorded that the therapist "discussed use of walker for safety during functional mobility." (Tr., at 484.)  The following day, August 5, the physical therapist noted that they were using a rolling walker.  Baker required minimal assistance initially, but needed increase assistance with distance, due to fatigue. (Tr., at 485.)

By October 18, 2010, though, Dr. Sundararajan noted that Baker's gait was slow "but dramatically improved from her last visit when she was requiring a walker." (Tr., at 650.)  She does not report having prescribed a walker (or a cane) for her.  Dr. Sundararajan provided additional reports on February 23, and April 11, 2011.  In February 2011, she reported that Baker's walking was "much better," and she was no longer using a walker or cane. (Tr., at 648.)  At both the February and April 2011 visits to Dr. Sundararajan, Baker's gait was reported as fairly normal. (Tr., at 647, 649.)

Dr. Sundararajan's opinion letter of August 3, 2011 reported that she had been treating Baker since June 2010, and as recently as April 2011.  She noted that

35

Baker had decreased sensation on the right side, but no motor deficits.  (Tr., at 644.) Dr. Sundararajan reported that, although Baker may fatigue quickly, "[s]he should be able to sit, stand, walk."  Dr. Sundararajan did not mention any need for a cane or walker.  (Tr., at 645.)

Dr. Fernandes' incomplete letter dated January 24, 2012, reported that Baker had an "unsteady gait."  (Tr., at 670.)  However, Dr. Fernandes made no mention of the need for a cane or walker, although, again, the remainder of the letter is not in the record.

At the July 11, 2012, hearing before the ALJ, though, Baker appeared with a walker.  Baker testified that it was prescribed by a Dr. Lynn [?] at Euclid [?] Hospital.  She mentions using the equipment during rehab after she got out of intensive care.  (Tr., at 48.)  Baker testified that she used the walker every day, and although she had a cane as well, she used the walker more often because it helped her to get around better.  (Tr., at 49.)  Thus, there appears to be an inconsistency between Baker's hearing testimony and Dr. Sundararajan's reports.

A recent case noted that:

. . . the Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work.  This device must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary.  A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane.  If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE.  The ALJ is only required to pose to the VE those limitations found to be credible.

36

*Murphy v. Astrue*, No. 2:11CV00114, 2013 WL 829316, at \*10 (M.D. Tenn. Mar. 6, 2013) (internal citations omitted).  In this case, the medical record reflects no prescriptions for a cane or walker, and the evidence does not support a medical necessity for one, other than during physical therapy shortly after the stroke.

Baker also contends that the RFC finding is not supported by substantial evidence insofar as the RFC only provides for an off-task accommodation of 5%. (Doc. 16, at 24.)  Baker does not point to any medical evidence which would necessitate a greater allowance, or any medical opinion which specifically states that Baker would be off-task more than five percent of the work-day.

The ALJ has the responsibility for reviewing all the evidence in making his determinations.  20 C.F.R. § 416.927(e)(2).  The ALJ evaluates every medical opinion received in evidence.  20 C.F.R. § 416.927(c).  The ALJ will consider any statements that have been provided by medical sources, whether or not based on formal medical examinations.  20 C.F.R. § 416.945(a)(3).  Although the ALJ reviews and considers all the evidence before him, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ.  20 C.F.R. § 416.946(c).  Here, the ALJ's findings were supported by relevant evidence and consistent with the record as a whole.  The court finds that the RFC determination in the ALJ's decision is based on substantial evidence in the record, as outlined in his findings and supported by medical evidence.  The fifth alleged error should be overruled.

## F.  Credibility

The sixth, and final, issue raised by Baker is that the ALJ's credibility
finding is not supported by substantial evidence, and was derived without following
the requirements of SSR 96-7p.  (Doc. 16, at 24.)  Baker states that the ALJ's
credibility determinations must be "based on a consideration of the entire case
record," and "must find support in the record."  (Doc. 16, at 24, quoting Gonzalez v.
Commissioner, No. 1:06CV687, 2008 WL 584927, at *5 (W.D. Mich. Jan. 17, 2008).)

The ALJ stated that he found Baker's statements concerning the intensity,
persistence and limiting effects of her symptoms not credible to the extent they
were inconsistent with the RFC finding.  He also stated that the overall record did
not support Baker's contention that her severe impairments were disabling.  (Tr., at
22.)  For example, the ALJ noted that Dr. Sundararajan stated that, while Baker
had decreased sensation on the right side, she did not have motor deficits.  (Tr., at
22.)  Similarly, the ALJ found the record does not show that Baker has sensory or
motor deficits, nor speech or memory difficulties related to the stroke.  (Tr., at 23.)

Baker does not specifically contest any specific aspect of the ALJ's credibility
findings.  She merely states that, "[w]hen properly reviewed, the consistency
between [Baker's] testimony, the medical record, the opinions of her doctors, and
the layperson statements, all support that finding her anything less than wholly
credible lacks the support of substantial evidence."  (Doc. 16, at 24-25.)

The ALJ's findings based on the credibility of the claimant are accorded great
weight and deference.  Walters v. Commissioner, 127 F.3d 525, 531 (6th Cir. 1997);

38

Gonzalez, 2008 WL 584927, at *5.  Although Baker challenges the ALJ's credibility findings, it is unclear on what basis her challenge is based, other than a vague statement that "all of [Baker's] medical conditions" had a debilitating effect on her, and that record as a whole demonstrates that the ALJ should not find her "anything less than wholly credible."  (Doc. 16, at 24-25; see also doc. 20, at 9.)

The court is unable to assess the merits of the sixth claim, based on the broad-based, vague allegations, and it should be overruled.


## IX.  SUMMARY

For the reasons discussed above, the court finds that the decision of the Commissioner is not supported by substantial evidence.  Specifically, the court finds that the ALJ's failure to address the severity of, or to include any limitations from, Baker's thalamic pain syndrome in determining her RFC is not harmless error, which requires the case to be reversed and remanded for further development and clarification of Baker's thalamic pain syndrome on her ability to work.   Stephens, 2010 WL 1368891, at *2; Meadows, 2008 WL 4911243, at *13.

In addition, at no point did the ALJ specifically discuss the elements of Listing 11.04 or 1.04, the specific evidence relevant to the Listing(s), and why he determined that evidence failed to satisfy the severity requirements of the Listing(s).  As Baker points out, there are arguably elements of the Listings in the record, yet the ALJ does not address them.  The ALJ's decision also should be remanded for a more thorough Step 3 determination.

39

The record evidence as discussed in the ALJ's decision is not such that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination.  The decision of the ALJ should be remanded, in accordance with this opinion.

## RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned  recommends that the decision of the Commissioner be **REVERSED AND REMANDED**.

                                                      s/ Kenneth S. McHargh
                                                      Kenneth S. McHargh
                                                      United States Magistrate Judge

Date:  July 15, 2015

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).